UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WILD FISH CONSERVANCY, a non-profit corporation,<br><br>Plaintiff,<br><br>v.<br><br>QUILCENE NATIONAL FISH HATCHERY; UNITED STATES FISH AND WILDLIFE SERVICE; KEN SALAZAR; U.S. ENVIRONMENTAL PROTECTION AGENCY; and LISA JACKSON,<br><br>Defendants. | CASE NO. C08-5585BHS<br><br>ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment (Dkt. 15) and Defendants' Cross-Motion for Summary Judgment (Dkt. 23). The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby denies Plaintiff's motion and grants Defendants' motion for the reasons stated herein.

**I. BACKGROUND**

**A.    Procedural History**

On September 30, 2008, Plaintiff Wild Fish Conservancy filed a complaint against Defendants Quilcene National Fish Hatchery ("Hatchery"); United States Fish and Wildlife Service; Dirk Kempthorne, in his official capacity as the Secretary of the U.S.

ORDER - 1

Department of Interior; U.S. Environmental Protection Agency ("EPA"); and Stephen Johnson, in his official capacity as the Administrator of the EPA. Dkt. 1.

On May 21, 2009, Plaintiff filed an Amended Complaint. Dkt. 13. Plaintiff substituted Ken Salazar, in his official capacity, for Dirk Kempthorne, and Lisa Jackson, in her official capacity, for Stephen Johnson. *Id*. ¶¶ 14, 16. Plaintiff claims that Defendants have violated the Clean Water Act ("CWA"), 33 U.S.C. § 1251, *et seq*., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 500, *et seq*. *Id*., ¶¶ 1-3. Plaintiff asserts three causes of action: (1) Violation of CWA – Hatchery is operating without a valid National Pollutant Discharge Elimination System ("NPDES") permit; (2) Violation of CWA – Hatchery has failed to comply with provisions of an NPDES permit that was issued in 1974; and (3) Violation of APA – EPA has unlawfully extended an expired NPDES permit. *Id*., ¶¶ 40-52.

On June 11, 2009, Plaintiff filed a Motion for Partial Summary Judgment. Dkt. 15.

On July 2, 2009, Plaintiff filed a Notice of Supplemental Authority informing the Court that the EPA had rendered a decision regarding the Hatchery's NPDES permit. Dkt. 22.

On July 13, 2009, Defendants responded to Plaintiff's motion and included a Cross-Motion for Summary Judgment. Dkt. 23. On August 24, 2009, Plaintiff replied to its motion and responded to Defendants' motion. Dkt. 30. On September 4, 2009, Defendants replied to their motion. Dkt. 31.

**B.     Clean Water Act**

The CWA was adopted to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve this goal, the CWA prohibits "discharge" of any "pollutant" into waters of the United States except in accordance with other provisions of the Act. 33 U.S.C. § 1311(a). "Discharge" includes "a discharge of a pollutant, and a discharge of pollutants." 33 U.S.C. §

1362(16). "Discharge of a pollutant" includes "addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The CWA defines a "point source" as:

> any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants may be discharged.

33 U.S.C. § 1362(14).

Section 402(a) of the CWA, 33 U.S.C. § 1342(a), authorizes the EPA to issue permits for the discharge of pollutants, as long as the applicable CWA requirements are met. Permits under section 402 are referred to as NPDES permits. Section 402(a) of the CWA also authorizes the EPA to create a program to implement the CWA's permitting requirements. 33 U.S.C. § 1342(a). Under CWA section 402(b), states may develop NPDES permit programs and submit them to the EPA for approval. Defendants claim that "Washington State is not authorized to issue NPDES permits to federal facilities," and therefore "the EPA retains the authority to determine all NPDES permitting issues regarding the Hatchery." Dkt. 23 at 3.

**C.     Regulation of Aquatic Animal Facilities**

The CWA does not contain a definition for "concentrated animal feeding operation." The EPA, however, has used its authority under the CWA to regulate "concentrated animal feeding operations" (40 C.F.R. § 122.23) as well as "concentrated aquatic animal production facilities" (40 C.F.R. § 122.24). The relevant regulation in this case creates two categories of "concentrated aquatic animal production facilities" ("CAAP facilities"), each of which is required to obtain NPDES permits. 40 C.F.R. § 122.24(a), (b).

A CAAP facility may be required to obtain a permit based on the size of its operation as follows:

> A hatchery, fish farm, or other facility is a concentrated aquatic animal production facility for purposes of § 122.24 if it contains, grows, or holds aquatic animals in either of the following categories:

ORDER - 3

> (a) Cold water fish species or other cold water aquatic animals in ponds, raceways, or other similar structures which discharge at least 30 days per year but does not include:
> (1) Facilities which produce less than 9,090 harvest weight kilograms (approximately 20,000 pounds) of aquatic animals per year; and
> (2) Facilities which feed less than 2,272 kilograms (approximately 5,000 pounds) of food during the calendar month of maximum feeding.
> ***
> "Cold water aquatic animals" include, but are not limited to, the *Salmonidae* family of fish; e.g., trout and salmon.

40 C.F.R. pt. 122, App. C.

In the alternative, a facility that falls below the threshold for automatic regulation may nevertheless be designated a CAAP facility and required to obtain an NPDES permit if the EPA determines that it is a "significant contributor of pollution to waters of the United States" that should be regulated under the permit program. 40 C.F.R. § 122.24(c)(1). This case-by-case designation process can be initiated by the EPA *sua sponte* or in response to a petition seeking designation of a specific facility. 40 C.F.R. § 122.24(c). In making a case-by-case designation, the EPA must consider the location and quality of the receiving waters; the holding, feeding, and production capacities of the facility; the quantity and nature of the pollutants reaching waters of the United States; and other relevant factors. 40 C.F.R. § 122.24(c)(1).

**D.    The Hatchery**

The Quilcene National Fish Hatchery, located approximately two miles south of Quilcene, Washington, has been in operation since 1911. Dkt. 8, Collection of Permit Related Documents, Exh. 24 at 1 (2006 NPDES Permit Application). The Hatchery is operated by the U.S. Fish and Wildlife Service. *Id*. at 2. In December 1974, the EPA issued an NPDES permit to the Hatchery. *Id*., Exh. 17. The 1974 Permit states that it "shall expire at midnight, August 31, 1979." *Id*. In 1980, the Hatchery submitted an NPDES permit application. *Id*., Exh. 18. In 1981, the EPA notified the Hatchery that the Hatchery's previous NPDES permit was being extended and the terms and conditions of that permit would remain in effect indefinitely until the EPA took action on reissuing the Hatchery's permit. *Id*., Exh. 19. In January 2006, the Hatchery submitted an updated

ORDER - 4

NPDES permit application to the EPA. *Id.*, Exh. 24. This application reported that April was the "calendar month of maximum feeding" and that "the total pounds of food" fed during that month was 3,160. *Id.*

In November 2008, the Hatchery submitted a letter to the EPA withdrawing its 1980 and 2006 NPDES permit applications and requesting that the EPA terminate the Hatchery's NPDES permit. *Id.*, Exh. 26. The letter explained that, upon review of the applicable regulations, the Fish and Wildlife Service determined that the Hatchery is excluded from the definition of "CAAP facility," because it uses less than 5,000 pounds of food to feed fish during the calendar month of maximum feeding. *Id.* The letter also stated that the Hatchery has used less than 5,000 pounds of food per month during the month of maximum feeding "for at least the past eighteen years." *Id.*

In a letter dated December 1, 2008, the EPA acknowledged that the Hatchery's operations were smaller than the size criteria established by rules governing CAAP facilities, and it concluded that "the Hatchery does not meet the definition of a CAAP [facility] and thus does not require an NPDES permit." *Id.*, Exh. 27.

On July 1, 2009, Defendant EPA issued a Response to Comments, Hatchery General Permit for Federal & Tribal Hatcheries in Washington June 2009. *See* Dkt. 22, Exh. 1. In that response, the EPA concluded as follows:

> Specific to the [Hatchery], we have information that it is below the feeding threshold for definition as a concentrated aquatic animal production facility and therefore ***is not considered a point source*** and does not need an NPDES permit. At the facility's request, we initiated the process to terminate its 1974 permit that was administratively extended in 1981; we have determined that the 1981 extension of the permit did not comply with the regulations governing administrative extension of permits. Therefore, there is no permit to terminate.

*Id.* at 6 (emphasis added).

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material

ORDER - 5

fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra)*. Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.     Plaintiff's Motion**

Plaintiff moves the Court for summary judgment in Plaintiff's favor on the issue of whether the Hatchery is violating the CWA by discharging pollutants. Dkt. 15 at 1.

Plaintiff claims that the question before the Court is whether "the pipes from which the [Hatchery] discharges pollutants to the Big Quilcene River are 'point sources,' [as defined by the CWA]." Dkt. 30 at 2. The EPA, however, issued an opinion that the Hatchery is not a point source. Dkt. 22, Exh. 1 at 6. Nonetheless, Plaintiff argues that:

> The relevant inquiry is whether Congress intended to authorize EPA to "define" pipes discharging pollutants from animal feeding operations that fall below the [concentrated animal feeding operation] or [concentrated aquatic animal production facility] criteria as "nonpoint source pollution." It is hard to imagine that EPA would ever argue that a pig operation that discharged manure to waters of the United States through a pipe constitutes nonpoint source pollution merely because the facility falls below the [concentrated animal feeding operation] criteria. This, however, is exactly how Defendants argue the [concentrated aquatic animal production facility] regulation should be applied.

Dkt. 30 at 5.

In *Association to Protect Hammersley, Eld, and Totten Inlets v. Taylor Resources, Inc.*, 299 F.3d 1007 (9th Cir. 2002), the Ninth Circuit was presented with the question of

> whether the mussel shells, mussel feces and other biological materials emitted from mussels grown on harvesting rafts, and thereby entering the beautiful waters of Puget Sound, constitute the discharge of pollutants from a point source without a permit in violation of the Clean Water Act

299 F.3d at 1009. The defendant hung its mussels from "mussel-harvesting rafts" which the Plaintiff argued were "point sources" under the CWA. *Id*. at 1011. Similar to the argument made in this case by Plaintiff, the plaintiff in *Taylor Resources* argued that, even if the defendant's mussel harvesting facilities did not meet the EPA's definition of a CAAP facility, "they still [fell] under the general definition, 'discernible, confined, and discrete conveyance,' or under the more specific definition, 'vessel or other floating craft.'" *Id*. at 1018. The court rejected this argument as follows:

> We have previously held that "'in the construction of administrative regulations . . . it is presumed that every phrase serves a legitimate purpose and, therefore, constructions which render regulatory provisions superfluous are to be avoided.'" *Rainsong Co. v. Fed. Energy Regulatory Comm'n*, 151 F.3d 1231, 1234 (9th Cir. 1998) (quoting *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1976)). In the context of aquatic animal harvesting, the EPA's regulations expressly exclude from the definition of "point source" facilities, like [Defendant's], that do not meet certain feeding thresholds. To hold that these facilities are nonetheless "point sources" under the statutory definition would render the EPA's [concentrated aquatic animal production facility]

ORDER - 7

> criteria superfluous and undermine the agency's interpretation of the Clean Water Act. *See Natural Res. Def. Council, Inc. v. Costle*, 568 F.2d 1369, 1382 (D.C. Cir. 1977) (EPA was given the power under the Act to define point sources).

299 F.3d at 1018-1019.

In this case, the Court finds that *Taylor Resources* is controlling precedent for the issue before the Court. As such, the Court rejects Plaintiff's argument that the Hatchery should be considered a "point source" despite the EPA's decision that the Hatchery is not a "point source." The EPA's regulations and decision regarding the Hatchery's permit requirements would be superfluous if the Court reached the alternative conclusion that the Hatchery's pipes were point sources under the CWA.

Relying on another Ninth Circuit opinion, Plaintiff argues that the EPA may not entirely exempt categories of discharges from NPDES permitting requirements. Dkt. 30 at 5-6 (citing *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Forsgren*, 309 F.3d 1181, 1190 (9th Cir. 2002)). In *Forsgren*, the Ninth Circuit addressed the issue of "whether spraying insecticide from aircraft (as the [United States] Forest Service is doing without a permit) is point source pollution or nonpoint source pollution." *Id*. at 1184. The regulation at issue was 40 C.F.R. § 122.27, which included the definition of a "Sulvicultural point source." *Id*. at 1185. The court stated that the "Forest Service reads the regulation as a blanket exclusion for all silvicultural pest control activities." *Id*. With regard to the authority of the EPA to define point source and non-point source pollution, the court recognized that

> the EPA has some power to define point source and nonpoint source pollution *where there is room for reasonable interpretation of the statutory definition*. However, the EPA may not exempt from NPDES permit requirements that which clearly meets the statutory definition of a point source by "defining" it as a non-point source.

*Id*. at 1190 (emphasis in original). The court held "that the aerial spraying at issue here is a point source and that the Forest Service must obtain an NPDES permit before it resumes spraying." *Id*.

ORDER - 8

In this case, Plaintiff argues that the "pipes from which the Hatchery discharges clearly meet the definition of 'point source,' which explicitly includes 'any pipe.' EPA cannot 'define' these pipes as nonpoint sources." Dkt. 30 at 6. Plaintiff's argument reaches well beyond the holding of *Forsgren*, as well as the facts before the Court. The issue before the Court is not whether 40 C.F.R. § 122.24 provides a blanket exclusion for all hatcheries, fish farms, or other facilities. In fact, under the regulation, the EPA reserves the right to require any hatchery, fish farm, or other facility to obtain a NPDES permit if the EPA determines that it is a "significant contributor of pollution to waters of the United States." 40 C.F.R. § 122.24(c)(1). Therefore, Plaintiff's reliance on the holding of *Forsgren* is misplaced.

With regard to the facts of this case, the EPA never "defined" the Hatchery's pipes as non-point sources. The EPA stated that the Hatchery "is below the feeding threshold for definition as a concentrated aquatic animal production facility . . . ." *See supra*. The Court is unaware of any authority for the proposition that a hatchery, fish farm, or other facility must obtain a NPDES permit if it falls below a threshold feeding requirement but discharges pollutants through a pipe. Moreover, Plaintiff's arguments on this point are unpersuasive.

Last, the Court declines Plaintiff's request to engage in a statutory interpretation analysis under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because the Court is bound by the Ninth Circuit's holding in *Taylor Resources*.

Therefore, the Court denies Plaintiff's motion for partial summary judgment on its first claim for relief.

**C.  Defendants' Motion**

Defendants move for summary judgment "as to all claims in this case." Dkt. 23 at 2. With regard to Plaintiff's first claim, the Court grants Defendants' motion because the Court has concluded that the Hatchery is not operating in violation of the CWA. *See*

*supra*. Plaintiff's remaining claims are as follows: Second Claim: Violation of CWA – Hatchery has failed to comply with provision of a NPDES permit that was issued in 1974; and Third Claim: Violation of APA – EPA has unlawfully extended an expired NPDES permit.

With regard to Plaintiff's second claim, Plaintiff concedes that the claim has been resolved because the Hatchery does not have a valid permit to violate. Dkt. 30 at 12-13. Therefore, the Court dismisses this claim.

Finally, Defendants argue that the Court does not have jurisdiction over Plaintiff's third claim. Dkt. 23 at 16. The CWA states that:

> Review of the [EPA] Administrator's action . . . in issuing or denying any permit under section 1342 of this title . . . may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts business which is directly affected by such action upon application by such person.

33 U.S.C. § 1369(b)(1). The Court agrees with Defendants that Plaintiff must challenge the EPA's extension of the Hatchery's NPDES permit at the Ninth Circuit Court of Appeals. Therefore, the Court dismisses this claim because the Court is without jurisdiction.

### III. ORDER

Therefore, it is hereby

**ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Dkt. 15) is **DENIED** and Defendants' Cross-Motion for Summary Judgment (Dkt. 23) is **GRANTED** as stated herein.

DATED this 19th day of October, 2009.

BENJAMIN H. SETTLE
United States District Judge